**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| TYRONE SYKES | **:** | |
| | **:** | |
| v. | **:** | Civil No. CCB-05-2846 |
| | **:** | |
| WICOMICO COUNTY, et al. | **:** | |
| | **:** | |

## MEMORANDUM

Now pending before the court is a joint motion for summary judgment filed by

defendants Officer Howard Phillips and Officer John Alessandrini.  The plaintiff, Tyrone Sykes,

has sued the defendants for alleged violations of federal and state law arising out of his arrest for

criminal trespass in Salisbury, Maryland.  The issues in this case have been fully briefed and no

hearing is necessary.  *See* Local Rule 105.6.  For the reasons stated below, the defendants'

motion for summary judgment will be denied.


## BACKGROUND

On September 22, 2004, at approximately six p.m., Deputies Phillips and Alessandrini

received a call from dispatch, informing them that Ms. Gladys Stewart, the owner of Stewart

Funeral Home in Salisbury, Maryland, called to report that a group of men were trespassing on

her property.  (*See* Def.'s Mem. at Ex. 2, Alessandrini Dep. at 11.)  Specifically, Alessandrini

reported that dispatch stated that "the owner of the business called and advised that there were

people loitering on her property, drinking beer and selling drugs."  (*Id.*)  The officers never

personally spoke to Stewart.  (*Id.* at Ex. 1, Phillips Dep. at 14.)

Deputy Phillips and Alessandrini responded to the call around the same time and, upon

-1-

arriving at the Funeral Home, the officers observed six men loitering in the parking lot.  (*Id*.)

The officers approached the men, and advised them they were trespassing and the owner of the

Funeral Home asked them to leave.  (*Id*.)  One of the men, Vincent Parker, became quite nervous

and ran away from the scene.  Officer Alessandrini ran after Parker with Officer Phillips close

behind.  Neither officer was able to catch Parker, and both returned to the Funeral Home parking

lot.  At the scene, another of the six men, Albert Flow, had not left the parking lot, and refused to

leave.  (*Id*. at Ex. 2, Alessandrini Dep. at 15-16.)  As a crowd began to form across the street,

Flow began cursing at the police officers, and Officer Alessandrini arrested Flow.  (*Id*.)

Sykes drove on the Funeral Home parking lot as Flow was being arrested.  Sykes reports

that he came to the Funeral Home because he had an appointment to meet Billy Handy at the

Funeral Home to discuss possible real estate transactions.  (Pl.'s Opp. Mem. at Ex. 4, Sykes Dep.

at 28-30.)  When Sykes came on the lot, he noticed that the man being arrested (Flow) was an

acquaintance of his.  According to the defendants, Sykes moved toward Flow and the officers

and began yelling.  (Def.'s Mem. at Ex. 2, Alessandrini Dep. at 21-22.)  Sykes reports that he

merely asked whether Flow was okay.  (Pl.'s Opp. Mem. at Ex. 4, Sykes Dep. at 39.)

Defendants asked Sykes what he was doing on the property, and whether he worked at the

Funeral Home.  When plaintiff responded that he did not work at the Funeral Home,

Alessandrini told Sykes that he needed to leave or be charged with trespassing.  (Def.'s Mem. at

Ex. 2, Alessandrini Dep. at 29-30.)  Sykes informed the officers that he was not trespassing, and

that he was there for some business.  (*Id*. at Ex. 1, Phillips Dep. at 25.)  The officers never

investigated whether Sykes was actually there for business purposes.  (*Id*. at Ex. 2, Alessandrini

Dep. at 31.)  After some back and forth over whether Sykes was, indeed, trespassing, Sykes

reports that Officer Phillips approached Sykes, began yelling at him, "shoved his finger in Sykes

face" and ordered "you will do whatever I tell you to do.  (Pl.'s Opp. Mem. at Ex. 4, Sykes Dep.

at 44-45.)  According to the defendants, Officer Phillips then told Sykes that he had three

seconds to leave or he would be charged with trespassing.  (Def.'s Mem. at Ex. 1, Phillips Dep.

at 25-26.)  Phillips next told Sykes that he could either go knock on the door to see if the Funeral

Home was open or leave the premises.  (*Id.*)

From this point, the facts are in dispute.  According to Sykes, he walked around the

officers and started toward the front door of the Funeral Home.  After walking several feet onto

the wheelchair ramp of the Funeral Home, Sykes reports that Phillips said "too damn late," and

somebody grabbed his arm from behind.  (Pl.'s Opp. Mem. at Ex. 4, Sykes Dep. at 48-49.)

Sykes states that he was not told he was under arrest.  (*Id.*)  Sykes turned around and grabbed the

arm that had touched him.  (*Id.*)  Sykes contends that as he turned, "Phillips yelled ... 'you're

under arrest', a second person jumped on Sykes's back and proceeded to strike him, while a third

person stated, 'I am going to pepper you.'" (*Id.* at 50-53.)  Sykes then states that he was

"blasted" by the pepper spray, which disoriented him, and made him stumble before landing on

his knees.  Sykes reports placing his hands on the ground, but the officer on his back pulled his

arms up toward his head, causing Sykes to go face first to the pavement.  (*Id.* at 55-56.)  The

officers then pinned Sykes's head into the ground, while applying the handcuffs.  After the

handcuffs were applied, the "officer that was standing on top of [Sykes], [took] his knee and

[dropped] it into the side of [Sykes'] face," while Sykes was pepper sprayed for a second time,

by an officer wearing shorts.  (*Id.* at 62-64.)  Sykes was not able to identify which officers

committed which acts, due, in part, to the pepper spray and the fact that the man beating him was

on his back. (*Id.* at 73.)

The defendants report a different story.  The defendants state that after telling Sykes that he could either go inside and take care of his business or leave, Sykes remained on the property to argue with the officers.  At that point, the officers decided to arrest Sykes for trespassing. (Def.'s Mem. at Ex. 1, Phillips Dep. at 26.)  The defendants contend that as a crowd of about thirty people were watching from across the street, Phillips grabbed Sykes, whereupon "Plaintiff turned around, yanked his arm away from Deputy Phillips" and began walking away from Phillips.  (*Id.* at 32-33.)  When Sykes began walking away from the Officers, they considered him to be "fleeing."  (*Id.* at 36.)  Defendants recount that they grabbed Sykes's arms from behind, but Sykes attempted to pull away.  (*Id.* at 34.)  Alessandrini reports that they were "outnumbered" by the crowd watching.  (*Id.*  at Ex. 2, Alessandrini Dep. at 24-25.)

As Phillips struggled with Sykes, Alessandrini shot a blast of pepper spray into Sykes's face, which caused Sykes and Phillips to fall to the ground.  (*Id.* at 27-28.)  The defendants contend that Sykes continued to resist arrest and the Deputies struggled to get Sykes's arms into handcuffs.  (*Id.* at 34.)  As Sykes continued to struggle and resist arrest, Deputy Alessandrini placed his knee on the back of Sykes's neck.  (*Id.* at Ex. 4, Statement of Probable Cause.) Around this time, a Deputy Arnold arrived and also helped the Deputies subdue Sykes.  (*Id.* at Ex. 2, Alessandrini Dep. at 32.)  The defendants claim that Deputy Phillips and Deputy Alessandrini never struck Sykes at any time.  (*Id.* at Ex. 2, Alessandrini Dep. at 32.)  The defendants aver that Deputy Arnold was the only officer wearing shorts that night, and was the officer that blasted the second pepper spray at Sykes and put his knee to Sykes's face.  (*Id.* at 12, 32, n.8.)  After the arrest, defendants note that Sykes apologized to Phillips because he felt it was

-4-

"the right thing to do."  (Pl.'s Opp. Mem. at Ex. 4, Sykes Dep. at 73-74.)

Other witnesses who viewed part of the incident also were deposed.  Keith Dockins, who was driving slowly by the incident, reported that he saw two officers talking to a black man, though he could not hear what was said at that time.  (Def.'s Mem. at Ex. 10, Keith Dockins Dep. at 19-20.)  Dockins testified that as the conversation progressed, "the smaller police officer all of a sudden just grabbed [Sykes], snatched him up and threw him on the ground him with – Sykes wasn't resisting."  *Id.* at 20.  Dockins testified that as Sykes went near the front ramp of the Funeral Home and was confronted with the police officer, "Mr. Sykes did not struggle," "Mr. Sykes was calm [and] did nothing to provoke what they did to him," and Dockins did not see Sykes try to break free from the officers.  *Id.* at 39-40.  Dockins also reported that once Sykes was on the ground, the police maced Sykes, while another officer "ran out and kneed Mr. Sykes on his neck," though Sykes was on his stomach and was not resisting.  *Id* at 20, 47.  Mr. Dockins's wife, Donzella, who was in the car with her husband at the time of the incident, also was deposed.  When she first observed Sykes, with whom she was previously familiar, Sykes was already handcuffed on the ground.  (*Id.* at Ex. 11, Donzella Dockins Dep. at 17.)  She observed the third officer rush to the scene and put a knee to the neck of Sykes when Sykes was on his stomach; Ms. Dockins reports that Sykes was "twisting around"at the time.  (*Id.* at 22-23.)  Finally, Chuck Wagner observed some of the events while also in his car.  In a very short deposition, Wagner testified that the officers used an "arm bar" to bring Sykes to the ground, but he did not observe any of the officers kick or punch Sykes. (*Id.* at Ex. 12, Wagner Dep. at 12.)

After Sykes was arrested, he was taken to Central Booking, where the police determined that he had no injuries worth treating.  (*See id.* at Ex. 5, Wicomico County Offender Booking

Information Report.) Deputy Phillips prepared a Statement of Probable Cause and a Statement of

Charges, charging Sykes with Trespass, Assault in the Second Degree, and Resisting Arrest.  (*Id.*

at Ex. 4, Statement of Probable Cause.)  Sykes claimed that he suffered swelling on his face and

neck as a result of the encounter, and visited the emergency room of a local hospital three days

later because he felt that his face was getting worse. (Pl.'s Opp. Mem. at Ex. 4, Sykes Dep. at

88.)  The doctors sent Sykes home with inflammatory pain medication, and Sykes reports that he

was unable to work for seven days subsequent to the incident.  (*Id.* at 89, 95.)

Sykes was tried in the District Court for Wicomico County, Maryland before Judge Scott

Davis for Wanton Trespass on Private Property under Maryland law in a bench trial.  Judge

Davis held that there was no probable cause to arrest Sykes for trespass.  *Maryland v. Sykes*,

Case No. 2H-33308, at 71-75 (Nov. 9, 2004).  Judge Davis found that Sykes was not one of the

people at the Funeral Home about whom Ms. Stewart called to complain.  *Id* at 72.  Judge Davis

held that Sykes had a plausibly reasonable basis for being on the property, and the police officers

were not able to determine that Mr. Handy was not at the premises when Sykes arrived on the

premises and was arrested.  *Id.* at 73.  Lastly, Judge Davis also noted "quite candidly, common

law indicates that one may resist reasonably in an unlawful arrest.  At that particular point in

time, there was not a lawful arrest." *Id.* at 74.  For those reasons, Judge Davis found Sykes not

guilty of the charge.

After the state trial, Sykes filed a letter with the City Council of the Wicomico County on

January 25, 2005, which was intended to provide notice of intent to bring a claim against the

County and/or Officer Phillips and Alessandrini for damages "for various torts,

constitutional violations and other related matters."  (Pl.'s Opp. Mem. at Ex. 7, Letter from

Sherwood Wescott to City Council, Wicomico County Government Office, dated January 25, 2005.)  Sykes filed a Complaint in this court on October 18, 2005, against Wicomico County, Deputy Howard Phillips, and Deputy John Alessandrini, which was subsequently amended. Wicomico County was subsequently voluntarily dismissed from the lawsuit.  The Amended Complaint alleged Assault (Counts One and Nine), Battery (Counts Two and Ten), False Imprisonment (Counts Three and Eleven), False Arrest (Counts Four and Twelve), Malicious Prosecution (Counts Five and Thirteen), Excessive Force (Counts Six and Fourteen), Violation of Maryland Declaration of Rights (Counts Seven and Fifteen), and Violation of 42 U.S.C. § 1983 (Counts Eight and Sixteen) against defendants Phillips and Alessandrini.

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## I.      Plaintiff's Federal Law Claims

### 1.      Illegal Search and Seizure

Sykes claims that his Fourth Amendment rights were violated because the defendants illegally searched his person after arresting him without a warrant.  It is settled that a search incident to an arrest is a "traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Currence*, 446 F.3d 554, 556 (4th Cir. 2006) (internal quotations omitted); *see also Michigan v. DeFillippo*, 443 U.S. 31, 35 (1979) ("The fact of a lawful arrest, standing alone, authorizes a search").  Sykes was searched incident to his arrest for trespassing.  As a matter of law, then, if Sykes's arrest was lawful, the search will also be lawful.

A warrantless arrest is lawful if it is supported by probable cause.  *See, e.g., Atwater v.*

*City of Lago Vista*, 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender").  "'Probable cause' to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *U.S. v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998) (*quoting DeFillippo*, 443 U.S. at 37).  Thus, "[w]hile probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict ... It is an objective standard of probability that reasonable and prudent persons apply in everyday life." *Id.* (*citing Brinegar v. U.S.*, 338 U.S. 160, 175 (1949)).  Probable cause is determined by analyzing the totality of the circumstances surrounding the arrest. *See U.S. v. McCraw*, 920 F.2d 224, 227 (4th Cir. 1990).

Here, the defendants contend that they had probable cause to arrest Sykes for criminal trespass.  Specifically, Maryland law prohibits a person from "remain[ing] on private property, ... after having been notified by the owner or the owner's agent not to do so."  Md. Code, Criminal Law, §6-403.  The defendants argue that when Stewart called dispatch to report that people were on her property, she effectively made the defendants her agents for purposes of §6-403 and, thus, defendants could properly inform Sykes that he was remaining on private property after being notified by the owner's agent not to do so.  As such, Sykes was in violation of the trespass law when he did not leave Stewart's property.  In response, Sykes argues that he was not in violation of the trespass statute because the defendants were not the agents of Stewart.  He further argues he was lawfully on Stewart's property.

Whether the defendants had probable cause to arrest partially turns on the scope of the agency relationship.  Under general principles of agency law, an agency relationship can be express or implied, and the scope of the relationship is defined by the creation of the relationship.  *See Green v. H&R Block, Inc.*, 355 Md. 488, 503-04, 735 A.2d 1039 (1999) (agency relationship may be express or implied); *Hardy v. Davis*, 223 Md. 229, 233, 164 A.2d 281 (1960) (authority created to perform a specific act is terminated when the purpose which called it into being is achieved).  In this case, the agency relationship between Stewart and the police was created by the phone call on September 22, 2004, at 6 p.m. as Stewart had had no previous contact with the defendants in regard to trespassing.  *Cf. Diggs v. Housing Authority of the City of Frederick*, 67 F. Supp. 2d 522, 525 (D. Md. 1999) (describing relationship where city authorized the police department to act as the agent for the city's Housing Authority through a formal letter written prior to any arrests for trespass).  In this phone call, the purpose and scope of the relationship was also defined - Stewart told dispatch that certain people were in Stewart's parking lot, loitering, drinking and selling drugs, and that she wanted the police to remove those people from trespassing on her property.  Acting as Stewart's agent, the defendants proceeded to the Funeral Home, and were properly able to give notice to the approximately six men assembled in Stewart's parking lot at the time Stewart called that they had no legitimate purpose on the premises.  The defendants exercised the authority granted to them by Stewart by removing those six men, including Flow.

While Stewart had given express instructions to the defendants to remove the men that were loitering on her property, Sykes was not on the property either when Stewart called the police or when the defendants arrived at the funeral home.  Further, a genuine dispute of material

fact exists as to whether Sykes had a legitimate purpose to be at the Funeral Home.  Sykes

reports that he came to meet with a Mr. Handy to discuss possible real estate transactions.  (Pl.'s

Opp. Mem. at Ex. 4, Sykes Dep. at 25-29.)  When Sykes arrived, Phillips asked Sykes if he

worked at the Funeral Home or was there to see someone.  (*Id.* at 46.)  Sykes responded that he

did not work at the Funeral Home, but was there to see somebody.  According to Sykes, Phillips

then told Sykes that he had three seconds to leave or to get to the building.  *Id.*

By telling Sykes that he had three seconds to get to the building, Phillips appeared to

acknowledge that Sykes had a lawful reason to be on the property.  The police had no reason to

believe Handy was not inside the Funeral Home at the time of the incident, as the defendants did

no investigation as to whether Handy was on the premises or whether Sykes had another

permissible business purpose.  *See, e.g., Torres v. State*, 147 Md. App. 83, 99, 807 A.2d 780

(2002) (finding no probable cause for trespass where officer did not check to see whether

appellant had been prohibited from the premises, and had, "at best, a 'hunch' that appellant

might be trespassing).  Nevertheless, after Sykes started walking to the building, Phillips grabbed

Sykes, told him, it was "too damn late," and began the process of arresting him.  If Sykes's

version of the facts is believed, the defendants did not have probable cause to arrest him for

trespassing or any other offense at the time he was seized.  *See Devenpeck v. Alford*, 543 U.S.

146, 125 S. Ct. 588, 593-94 (2004).

### 2.      Qualified Immunity

The defendants further argue that even if they did not have probable cause to arrest Sykes

for trespassing, they are protected from liability by the doctrine of qualified immunity.

Government officials performing discretionary functions are entitled to immunity from liability

for civil damages to the extent that "their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982).  When evaluating a claim of qualified immunity, the court first must

consider the threshold question of whether the facts alleged, taken in the light most favorable to

the plaintiff, show that the officer's conduct violated a constitutional right.  *See Saucier v. Katz,*

533 U.S. 194, 201 (2001).  If the plaintiff has stated a constitutional violation, then the court

must consider whether the right was "clearly established" at the time of the violation.  *See id.*

This second step in the qualified immunity analysis asks "whether it would have been clear to a

reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

"This is not to say that an official action is protected by qualified immunity unless the very

action in question has previously been held unlawful, but it is to say that in the light of

preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640

(1987).  Because qualified immunity is an affirmative defense, the defendants must establish that

it would not be clear to a reasonable officer that his conduct was unlawful in the situation

presented.

Sykes argues that the relevant constitutional right is the right to be free from unlawful

search and seizure.  (Pl.'s Opp. Mem. at 14-15.)  But Sykes's formulation of the defined right is

too abstract to be helpful here.  The constitutional right that Sykes claims was violated, defined

at the proper level of specificity, is the Fourth Amendment right to avoid a warrantless arrest,

where the defendants arrested plaintiff for criminal trespass without express authorization from

the owner, and where plaintiff articulated a plausibly legitimate reason for being on the premises.

The qualified immunity question presented, then, is whether in September 2004, this right was clearly established and whether a reasonable officer would have understood that the conduct at issue violated it. *Miller v. Prince George's County*, 475 F.3d 621, 626-27 (4th Cir. 2007); *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004).

Articulated as such, the right does appear to have been clearly established at the time of the violation. Under the Maryland trespass law, only the owner or the owner's agent has the authority to order people off private property. Maryland law does not support the proposition that police officers have the inherent authority to inform citizens that they are improperly on private property; instead, case law suggests that the Police have the power to inform citizens they are trespassing only if there is a prior agreement giving the police such authority. *See Diggs*, 67 F. Supp. 2d at 525 (discussing legality of prior agency agreement between city and police to enforce trespass law); *Torres*, 147 Md. App. at 95, 807 A.2d 780 (describing Baltimore City law which prohibits individuals from remaining on private property after being told by owner or owner's agent that they were not wanted on property). The defendants pointed to no case law suggesting otherwise. Here, Sykes articulated a reason for being on the premises, the defendants made no investigation as to whether Sykes was actually permissibly on the property, and the defendants had no express instructions to remove Sykes from the property. Accordingly, it does appear that the law on this issue is clearly established - an arrest for trespass, and subsequent search, by the police without express authorization or prior agreement, and where the plaintiff articulates a plausibly legitimate reason for being on the premises, which has been acknowledged by the officer, is a constitutional violation. Again, accepting Sykes's version of the facts as true, the defendants have offered no explanation why a reasonable officer would have thought the

arrest was lawful.

The defendants alternatively suggest that even if it were clearly established that there was no probable cause to arrest Sykes for trespass, they are still entitled to qualified immunity because, at worst, defendants merely arrested Sykes for the wrong crime.  (Def.'s Reply, at 7.) The defendants argue that Sykes was violating several laws at the time of his arrest (i.e. disorderly conduct, hindering police, disturbing the peace, or failure to obey a lawful order), and the defendants could have arrested him for any of several reasons.  *Id.*  The defendants did not explain why, under Sykes's version of events, probable cause existed to arrest the plaintiff for the other laws he supposedly violated.  Indeed, in the proceeding in state court, the city did not attempt to prosecute plaintiff for any of these other crimes.  Indeed, it is legal at common law to resist an unlawful arrest, and defendants' claims of other crimes stem in large part from plaintiff's resistance of his unlawful arrest.  *State v. Wiegmann*, 350 Md. 585, 606-07, 714 A.2d 841 (1998) (noting that Maryland follows the long standing common law privilege allowing persons to resist illegal warrantless arrests and that the Maryland legislature has not abolished the privilege).

## II.    Plaintiff's State Law Claims

### 1.    Compliance with the MTCA

The defendants allege that plaintiff's state law claims are barred due to Sykes's failure to comply with the notice requirements of the Maryland Tort Claims Act ("MTCA").  *See* Md. Code (1984, 1999 Repl. Vol. 2001 Cum Supp.) §12-101 *et seq*. of the State Government Article ("SG").  The MTCA provides that a claimant may not institute an action, unless the claimant

submits a written claim to the Treasurer of the State within one year of the injury. SG §12-106(b).  Sykes explains that he thought the defendant police officers were local employees, not state employees, and thus, filed notice with the Salisbury City Council (but not the State Treasurer) within the twelve month period prescribed by the MTCA.  (*Id.* at Ex. 7, Letter from Sherwood Westcott to City Council, dated Jan. 25, 2005.)  While the lack of notice to the state would bar Sykes's claim against Wicomico County, it has no effect on his claims against any individual state employees.  *See Chinwuba v. Larsen*, 142 Md. App. 327, 790 A.2d 83, 100-01 (Md. Ct. Spec. App. 2002), *rev'd in part on other grounds* 377 Md. 92, 832 A.2d 193 (Md. 2003) (noting that improper notice under the MTCA barred a claim against a state agency, but not against the agency's commissioner).  Because the notice provisions of the MTCA do not implicate individual state employees, Sykes's possible failure to comply with the MTCA does not bar his claim.[1]

### 2.      Statutory Immunity

The defendants further claim that they are entitled to statutory immunity for the state law claims alleged in Sykes's complaint.  Under Maryland statutory law, individual state government employees are immunized from tort liability for acts or omissions committed within the scope of their employment and done without actual malice or gross negligence.  *See* Md. Code Ann., Cts. & Jud. Proc. § 5-522(b) (1994); *Lee v. Cline*, 384 Md. 245, 863 A.2d 297, 311 (2004); *see also*

---

[1] Sykes argues that he "substantially complied" with the MTCA by filing notice with the City Council and by serving the individual defendants with the complaint in this case.  (Pl.'s Opp. Mem. at 15-17.)  As the MTCA does not bar the claims against the individual defendants, I need not decide whether Sykes's actions constituted "substantial compliance."

*Shoemaker v. Smith*, 353 Md. 143, 725 A.2d 549, 560 (1999) (stating that required showing of malice is "actual malice").  The defendants appear to concede that they were acting within the scope of their employment during the events in question, so the officers are not entitled to statutory immunity under the MTCA if they acted with malice or gross negligence.

The Maryland courts have noted that the existence of malice should typically not be disposed of at summary judgment, but should be left to the fact-finder.  *See, e.g., Thacker v. City of Hyattsville*, 135 Md. App. 268, 762 A.2d 172, 189 (Md. Ct. Spec. App. 2000).  But normal pleading rules apply, and to survive a motion for summary judgment, "the plaintiff must point to specific evidence that raises an inference that the defendant's actions were improperly motivated," and involved actual malice.  *Thacker*, 135 Md. App. 268, 762 A.2d at 189-90.  "Actual malice" requires showing that an employee "intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff."  *Thacker*, 135 Md. App. 268, 762 A.2d at 189 (quoting *Shoemaker*, 725 A.2d at 560); *see also Shoemaker*, 725 A.2d at 560 (stating that malice requires showing that the defendant's conduct "was motivated by ill will, by an improper motive, or by an affirmative intent to injure [the plaintiff]").  Malice can be inferred from the surrounding circumstances, and may be found even if a state employee's actions were objectively reasonable.  *See Cline*, 384 Md. 245, 863 A.2d at 311.

The plaintiff in this case has pointed to some specific evidence raising an inference that defendant officers acted with malice.  Sykes alleges that after defendant Phillips gave Sykes "three seconds" to get into the building, Phillips said "too damn late" and Sykes was grabbed from behind.  What happens next is contested, but Sykes alleges that as he turned around,

Phillips yelled "you're under arrest"; simultaneously, a second person jumped on Sykes's back, while a third person stated, "I am going to pepper you."  Sykes contends that as someone continued to strike him in the back, he was hit with the pepper spray.  The pepper spray blast forced Sykes to the ground, where another officer pulled Sykes arms toward his head, "causing Sykes to go face first to the pavement."  Sykes was then handcuffed, and an officer "dropped his knee into the side of Sykes's face."  While handcuffed, Sykes was pepper sprayed again for a period of ten seconds, though that pepper spray appears to have been administered by Deputy Arnold, who has not been sued in this litigation.

Taking the facts in the light most favorable to Sykes, he has offered specific evidence sufficient for the jury to find the defendant officers acted with actual malice. In a case with similar facts, the plaintiff alleged that a police officer "roughly dragged" the plaintiff, struck the plaintiff "in the head and neck", and had his handcuffed hands twisted in retaliation for not following immediately the officer's instructions.  *Okwa v. Harper*, 360 Md. 161, 757 A.2d 118, 129 (Md. 2000).  In *Okwa*, the Court of Appeals found that taking plaintiff's facts to be true, plaintiff's allegations were sufficient to find that the officers acted with malice.  In *Sawyer v. Humphries*, the Court found that a police officer "wrestling another to the ground, pulling his hair, and hitting him on the face, ...without cause or provocation, is certainly malicious conduct." *Sawyer v. Humphries*, 322 Md. 247, 587 A.2d 467, 474 (Md. 1991).  Here, jumping on Sykes's back, continuously striking him, and forcing Sykes to go face forward into the pavement could constitute the malice necessary to defeat immunity, especially given that Sykes contends he gave the police no cause to use force.  Malice can be further inferred from the defendants initiation of force as Sykes walked away.  Mr. Dockins testified that Sykes was not resisting during the

encounter.  The defendants, of course, contest Sykes's version of events, but there is sufficient

dispute of material fact for the jury to decide whether there is malice sufficient under the MTCA

to defeat statutory immunity.


                3.        **Excessive Force**

        In addition to his federal constitutional claims under the Fourth Amendment, Sykes also

alleges that defendants used excessive force in violation of his rights under Articles 24 and 26 of

the Maryland Declaration of Rights.  On the merits, the analysis applied to this claim is the same

as the analysis applied to an excessive force claim under the Fourth Amendment.  *See Miller*,

475 F.3d at 631, n.4 (noting that the plaintiff's claims under Articles 24 and 26 are construed in

*pari materia* to his constitutional claims); *Richardson v. McGriff*, 361 Md. 437, 762 A.2d 48, 56

(2000) (stating that the principles applied to excessive force claims under the Fourth Amendment

are the appropriate principles to apply to similar claims under Article 26).

        The Supreme Court has held that claims against law enforcement officers for the alleged

use of excessive force during an arrest should be analyzed under the Fourth Amendment's

objective reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  With regard

to an excessive force claim, the reasonableness inquiry "requires careful attention to the facts

and circumstances of each particular case, including the severity of the crime at issue, whether

the suspect poses an immediate threat to the safety or the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight."  *Id*. at 396.  Moreover, the

reasonableness of the force used is assessed from the perspective of a reasonable officer on the

scene, rather than with the 20/20 vision of hindsight.  *Wilson v. Flynn*, 429 F.3d 465, 468 (4th

Cir. 2005).

The defendants argue that their conduct was not objectively unreasonable.  The police officers submit that, prior to the arrest, the officers and Sykes repeatedly argued over whether Sykes was trespassing, and Sykes did not submit to the officers' request to leave the premises. As such, the defendants claim that "it was reasonable for the Deputies to believe that Plaintiff would also 'balk' at being arrested."  (Def.'s Mem. at 30.)  The defendants also argue that force was needed to subdue Sykes because he "turned around and grabbed [Deputy Phillips'] arm." Sykes Depo. at 45-50.  The defendants characterize Sykes's actions as "resisting arrest," and contend that because plaintiff grabbed Phillips' arm, it was objectively reasonable for the defendants to use force to arrest Sykes.

While a close call, taking the facts in the light most favorable to the plaintiff, there is a genuine dispute of material fact concerning whether defendants used excessive force in arresting Sykes.  The *Graham* factors, in particular, weigh in Sykes's favor.  First, Sykes was arrested for trespass, clearly a minor crime.  *See e.g., Young v. Prince George's County*, 355 F.3d 751, 757 (4th Cir. 2004) (reversing grant of summary judgment where plaintiff "was stopped for a minor traffic violation, was completely cooperative and posed little, if no, threat once he was handcuffed behind his back"); *Tavakoli-Nouri v. State*, 139 Md. App. 716, 732, 779 A.2d 992 (2001) (reversing grant of dismissal where appellant "was suspected of committing a crime involving property damage ..., not violence to a person").  Second, the defendant police officers made no allegation that Sykes posed an immediate threat to their safety;  Sykes was not armed, nor did the police suspect that he was armed.  *See Jones v. Buchanan*, 325 F.3d 520, 528-29 (4th Cir. 2003) (finding second *Graham* factor not met where plaintiff was not armed or suspected of

-19-

being armed); *Okwa*, 360 Md. at 200, 757 A.2d 118 (denying summary judgment on excessive

force claim where plaintiff was unarmed, and confronted in a relatively sparsely populated area

by three officers).  Sykes testified that he posed no danger to the officers, did not threaten them,

and was walking away from the officers and toward the Funeral Home when he was arrested.

The third *Graham* factor also weighs in favor of denying summary judgment.  According

to Sykes, the police made no verbal attempt to arrest Sykes before using physical force.  While

Sykes admits that he grabbed Phillips' arm, after Phillips grabbed him, Sykes contends that he

did so non-violently.  Immediately after Sykes grabbed Phillips' arm, an officer jumped on

Sykes's back and began striking him, while another officer pepper sprayed him.  (Pl.'s Opp.

Mem. at Ex. 4, Sykes Dep. at 50-53.)  At this point Sykes alleges that he did not resist the arrest.

(*Id.*)  Keith Dockins supports this view and testified that Sykes offered no resistance in the arrest,

though his wife testified that Sykes was "twisting around."  Where a plaintiff claims he did not

resist or evade arrest, *Graham* weighs against granting summary judgment.  *See Rowland v.

Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (denying summary judgment where "while there is some

evidence that [plaintiff] offered resistance, the facts on this point are disputed. [Plaintiff]

maintains that he resisted only to the extent of instinctively trying to protect himself from the

defendant's onslaught").  Although the defendants contend that Sykes was both resisting arrest

and fleeing, the resolution of any factual disputes are a question for the jury at trial.  Thus, under

the facts as alleged by Sykes, the defendants are not entitled to summary judgment for the

excessive force claim because the amount of force used to arrest Sykes appears to be

disproportionate to the offense for which he was charged and the threat to safety that he posed.[2]

Taken in sum, the *Graham* factors suggest that the defendants did not use objectively reasonable force in arresting Sykes because the amount of force used to arrest Sykes seems disproportionate to the offense with which he was charged and the threat to safety that he posed. Based on the foregoing, the motion for summary judgment on Sykes's excessive force claim should not be granted.

### 4.      Assault and Battery

Defendants argue they are entitled to summary judgment with respect to plaintiff's assault and battery claims in Counts I, II, IX, and X.  Battery is defined as an intentional and unlawful touching, which is harmful or offensive.  *Elias v. Maryland*, 339 Md. 169, 183-84, 661 A.2d 702 (1995).  Police officials are not responsible in inflicting injury on a person being arrested, unless the officer acts with malice or gross negligence.  *Cline*, 384 Md. at 256, 863 A.2d 297.  In the MTCA context, malice exists when an officer acts from improper motivation or ill will.  *Id.*  As discussed above, if Sykes is believed, the police officers lacked probable cause in arresting Sykes for trespass, which could make the defendants' subsequent actions unlawful.  As stated in the statutory immunity discussion, taking the facts in the light most favorable to the plaintiff, the jury could also find malice in the defendants' actions.  As such, the motion for

---

[2]The severity of Sykes's injuries and how they were caused are also in dispute.  Sykes alleges that he suffered swelling and soreness on his neck and back and went to the hospital three days later to seek treatment.  (Pl.'s Opp. Mem. at Ex. 4, Sykes Dep. at 87-88.)  The doctor performed a CAT scan, which revealed internal swelling, and gave Sykes some pain medication to treat the symptoms.  (*Id.* at 89.)  These are the only injuries that Sykes alleges.  No hospital records were provided by either side.  As the other claims survive summary judgment, it is appropriate for the jury to resolve the question of the severity of Sykes's injuries.

summary judgment on Sykes's state law assault and battery claims should not be granted.

### 5.      False Imprisonment and False Arrest

Defendants argue that because they had probable cause to arrest plaintiff, they are, thus, not liable for false arrest or false imprisonment.  *See Ashton v. Brown*, 339 Md. 70, 119, 660 A.2d 447 (noting that false imprisonment can only occur where legal authority is lacking).  As already discussed, because there is a dispute of material fact on this issue, summary judgment for the false imprisonment and false arrest claims is not appropriate.

### 6.      Malicious Prosecution

In order to establish a claim for malicious prosecution, Sykes must prove: 1) the defendant instituted criminal proceedings against the plaintiff, 2) the criminal proceeding was resolved in the plaintiff's favor, 3) the defendant did not have probable cause to institute the proceeding, and 4) the defendant acted with malice or a primary purpose other than bringing the plaintiff to justice.  *Okwa*, 360 Md. 161, 757 A.2d at 130; *Hines v. French*, 157 Md. App. 536, 553-54, 852 A.2d 1047 (2004).  Here, the state criminal proceeding was resolved in the plaintiff's favor.  Defendants argue that Sykes cannot satisfy prongs one, three, and four of the malicious prosecution test.

Defendants first argue that only Officer Phillips instituted the criminal proceeding against Sykes, and that Officer Alessandrini took no part.  For purposes of malicious prosecution claims, "[w]here a party instigates, aides or assists in a criminal prosecution he/she may be liable even where he/she did not swear out a warrant."  *Smithfield Packing Co. v. Evely*, 169 Md. App. 578, 593, 905 A.2d 845 (Md. 2006).  Thus, the bare fact that Officer Phillips swore out the warrant

does not insulate Officer Alessandrini from the claim of malicious prosecution.  Prongs three and

four have been discussed above.  The motion for summary judgment on the malicious

prosecution claims also will be denied.


     A separate order follows.



   __March 30, 2007___                    _____/s/_____
Date                                       Catherine C. Blake
                                         United States District Judge